# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

In re:                                                     Chapter 11

THE GLEBE, INC.,                                           Case No. 10-71553

Debtor.

## AFFIDAVIT OF ROBERT H. GERNDT, EXECUTIVE DIRECTOR OF THE GLEBE, INC. IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

COMMONWEALTH OF VIRGINIA)
                              ) ss:
COUNTY OF BOTETOURT    )

I, Robert H. Gerndt, of full age, being duly sworn, state that the following is true and correct to the best of my knowledge, information and belief:

1.      I am the Executive Director of The Glebe, Inc. ("**The Glebe**"), a Virginia non-stock not for profit corporation and a Continuing Care Retirement Community ("**CCRC**"). The Glebe's sole corporate member is Virginia Baptist Homes, Inc. ("**VBH**"), also a Virginia non-stock not for profit corporation, which, together with The Glebe and a family of CCRC's in Virginia, have undertaken a charitable mission to provide quality care to the elderly for more than 60 years.  Given my current role, I am familiar with the day-to-day operations, business and financial affairs of The Glebe.[1]

2.      On the date hereof (the "**Petition Date**"), The Glebe filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). As explained in more detail below, The Glebe has commenced this chapter 11 case in order to restructure its debt so that The Glebe may continue to operate as a financially healthy and viable CCRC for its existing and prospective residents.

---

[1] The last four digits of the taxpayer identification number for The Glebe is 7966.

3.     I submit this affidavit: (a) to explain to the Court and other interested parties the circumstances that compelled The Glebe to seek relief under the Bankruptcy Code, and (b) in support of the relief requested in the limited "first day" motions filed by The Glebe (the "**First Day Motions**"). Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge and/or the knowledge I have acquired from those who report to me, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning The Glebe's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this affidavit.

4.     Part I of this affidavit provides background with respect to the business and assets of The Glebe and the events leading to the commencement of this case. Part II sets forth relevant facts in support of The Glebe's First Day Motions.

## I.     BACKGROUND

**A.     Corporate Structure and Operations**

5.     The Glebe is a Virginia non-stock, not for profit 501(c)(3) organization that is operated as a faith-based community.  Opened in 2005, The Glebe consists of approximately 338,000 square feet located on 65 acres just north of Daleville, Botetourt County, Virginia.  The Glebe has 198 residents residing in one of three types of living options:  (i) Independent Living (146 residents residing in 114 units); (ii) Assisted Living (22 residents in 18 units); and (iii) Health Care Center (30 residents in 30 units).   The Glebe's current occupancy rate is approximately 72%.  Typical of CCRCs, The Glebe charges residents monthly fees for services rendered.   The Glebe's model is premised upon residents paying a sizable initial entrance fee and thereafter paying modest monthly "rent."  Upon entrance to The Glebe, residents enter into

agreements known as "Life Care Contracts" which detail the requirements of the one-time entrance fee and a monthly service fee depending upon the living options selected. Generally these payments entitle residents to the use and privileges of The Glebe for life, including on-site health services as needed. The standard life care contract entrance fees (apartments and cottages) for a single person range as follows: one-bedroom apartment for $123,000 to a two-bedroom cottage for $324,000. For single occupancy, monthly fees range from $2,400 to $3,865. The standard Life Care Contract contains a refund provision that expires ratably over 50 months from the resident's date of entrance.

(i) <u>Independent Living</u>. Residents choosing the "Independent Living" option live in an apartment or cottage with access to all of The Glebe's services. The services through the comprehensive continuum of care are included in the monthly service fee and are designed to support and enhance the residents' independence. Among the services are one meal per day served in the dining room, regular housekeeping and maintenance services, professionally directed as well as individual exercise opportunities through the fitness center, on-site pharmacy and rehabilitative therapy, clinic services, and scheduled transportation for shopping, cultural events, and medical appointments. Under the Life Care Contract, short- and long-term care for the same monthly fee is also provided in the on-site assisted living and nursing care, just down the hall from a spouse and friends. Beyond the entrance fee and monthly fee, the only additional cost to residents is for two additional meals per day and ancillary services (i.e., medical supplies) incurred at residents' election. For socialization, residents enjoy expansive walking paths, garden and greenhouse, woodworking shop as well as life long learning in partnership with Hollins University, the spiritual life committee, bible studies, vesper services, and volunteering in Assisted Living and Nursing Care. Residents and their families have peace of mind through

two services located in the residences: the urgent call system and the passive motion detector daily check in service. These services help residents lead fulfilling lives and supports their physical health, their well-being and their spiritual lives. A priority for many residents is volunteering in the local community giving time and resources to organizations, including civic groups, the Salvation Army, a local community college foundation, and elementary schools, churches and free clinics.

(ii) <u>The Assisted Living Center</u>. The Assisted Living Center provides 32 private residences with supportive care. Each residence is licensed to provide double occupancy to accommodate couples. Services and care are provided for those who need assistance with the activities of daily living, such as bathing, personal care and medication administration. Residents receive three meals daily in a restaurant-style setting. The Assisted Living apartments feature a living room, kitchenette, bedroom and full bathroom.

(iii) <u>The Health Care Center</u>. The Health Care Center offers 32 private rooms and provides nursing services including 24-hour supervision from licensed nursing and health care personnel. In many cases, nursing care is only required for a short amount of time, such as after a hospital stay. In those instances, the emphasis is placed on helping residents to rehabilitate as quickly as possible. Long-term care is also available, with compassionate caregivers and the highest quality of care possible.

6.      The Glebe's business model contemplated that the advance entrance fees would provide necessary capital for repayment of The Glebe's secured debt, and the monthly fees would be utilized to fund operations. Recently, on June 3, 2010, The Glebe received its Medicare Part A certification, which should result in additional monthly income and potentially attract new residents.

7.     The Glebe employs approximately 190 individuals, including administrative, marketing, housekeeping, food and beverage, maintenance, and resident services personnel at a bi-weekly salary expense of approximately $128,000.

8.     Effective October 10, 2008, The Glebe entered into a Management and Marketing Agreement with CRSA Management, LLC ("**CRSA**")[2], an experienced CCRC management firm with 21 retirement community clients in 12 states, to oversee The Glebe's operations, finances and marketing.

9.     Since its inception, The Glebe has been a party to a Cooperation and Operation Agreement with VBH that permits The Glebe to take financial advantage of certain shared services, including insurance, treasury, and management functions with VBH and the three other CCRC facilities for which VBH is the sole corporate member.

**B.     Capital Structure**

10.     As of the Petition Date, The Glebe had liabilities in excess of $81 million. A majority of the liabilities comprise of a loan (the "**Prepetition Loan**") in which The Glebe borrowed the principal sum of $55,540,000.00 from the Industrial Development Authority of Roanoke County, Virginia (the "**Authority**") pursuant to a Loan Agreement, a Promissory Note and a Deed of Trust and Security Agreement, each dated as of December 15, 2003 (together, the "**Prepetition Loan Documents**"), such funds being the proceeds of the sale of those certain *Industrial Development Authority of Roanoke County, Virginia Residential Care Facility Revenue Bonds (The Glebe, Inc.)* (the "**Bonds**") which are governed by a Master Trust Indenture and an Indenture of Trust, each dated as of December 15, 2003 (together, the "**Bond Documents**"). The Bonds are secured by a security interest in substantially all of The Glebe's

---

[2]  In May 2010 CRSA was acquired by Life Care Services, LLC and now operates as CRSA/LCS Management, LLC.

assets, including The Glebe's real and personal property, accounts receivable, deposit accounts, inventory and other liquid or semi-liquid funds (collectively, the "**Collateral**").  U.S. Bank National Association serves as the Trustee under the Bond Documents (the "**Bond Trustee**"), and the Bonds are held by approximately **[200]** retail and commercial investors (the "**Bondholders**").  The proceeds from the Bonds were loaned by the Authority to The Glebe to finance the construction and equipping of the facility as well as fund a debt service reserve fund.

11.   The repayment obligations under the Prepetition Loan included certain intermediate bonds (the "**Intermediate Term Bonds**") and long term bonds (the "**Long Term Bonds**").  Of the total Intermediate Term Bond debt, $15,000,000 consists of Intermediate Term Bonds that matured on July 1, 2008.  Another $635,000 of Intermediate Term Bonds matured on July 1, 2009.  It was anticipated that a sufficient number of senior adults would enroll at The Glebe within two years of its opening to enable repayment of the short term loan obligations. This did not happen.  The global economic downturn, which has and continues to be hard-felt in the Roanoke Valley, resulted in lower than expected occupancy at The Glebe.  As a result, The Glebe determined in April 2008 to discontinue payment of principal and interest on the Bonds, including required sinking fund principal payments due in 2008 or 2009.  While there has been a default in the principal payments, I understand that the Bond Trustee maintains two funds, including a debt service reserve fund, with a current balance in excess of $5 million.  From this principal reserve, I understand that the Bond Trustee has elected to use the funds to pay semi-annual interest payments of approximately $1.5 million.  The next scheduled interest payment is July 1, 2010.

12.     On or about January 24, 2008, U.S. Bank declared an event of default.  Although the Bond Trustee has not demanded repayment of the Bonds, as a result of the event of default, the Bonds are subject to various remedies including acceleration by the Bond Trustee.

## II.     EVENTS LEADING TO CHAPTER 11

13.     The confluence of several events led to the filing of this Petition:  (i) construction delays, the recessive economy, the declining housing market, and a legal battle with Botetourt County over its real estate tax exemption, resulted in less than anticipated occupancy rates from 2005 to 2007; (ii) the lower occupancy rates led to fewer initial entrance fees, which were vital to the repayment of the Bond obligations; and (iii) the subsequent default under the Prepetition Loan precipitated the Cease and Desist Agreement (defined below) issued by the Commonwealth of Virginia State Corporation Commission through the Bureau of Insurance ("**Commission**"), prohibiting The Glebe from accepting future entrance fees.  The combination of these events pre-ordained The Glebe's financial distress, limiting The Glebe's ability to repay the Prepetition Loan due to the Commission's restriction on accepting entrance fees while simultaneously prohibiting The Glebe from accepting entrance fees because it cannot pay its bond debt.

14.     As a CCRC, The Glebe is governed by the Virginia Continuing Care Provider Registration and Disclosure Act ("**Act**"), which is administered by the Commission.  The Act authorizes the Commission to take steps to protect residents or prospective residents when the Commission determines that a CCRC is "financial instable."  Financial instability includes the provider's inability to meet the pro forma income or cash flow projections filed with the Commission where such failure may endanger the ability of the provider to perform fully its obligation pursuant to its continuing care contracts, including refunds.

15.     Having defaulted on the Prepetition Loan, The Glebe entered into a Cease and Desist Consent Agreement (**"Cease and Desist Agreement"**) with the Commission on May 7, 2008.   The Cease and Desist Agreement provides that until such time as the Commission determines The Glebe is financially stable, The Glebe will cease and desist from collecting entrance fees from prospective residents.

16.     On June 17, 2009 The Glebe petitioned the Commission for a modification of the Cease and Desist Agreement wherein The Glebe proposed to accept only the non-refundable portion of the entrance fees with the remainder of the entrance fees to be placed into a protected, third-party managed escrow.   An entrance fee typically is paid to a CCRC upon entrance into a facility.   While the CCRC is permitted to use such entrance fee as income, the CCRC earns such fee ratably over a period of time.   In The Glebe's case, this period is 50 months.   Thus, until completely earned by a CCRC, a portion of a resident's entrance fee is subject to a refund to such resident and comprises a general unsecured obligation of such CCRC.   The Glebe sought to address the Commission's concern by escrowing a resident's entry fee, accepting only that portion of such entrance fee as and when earned by The Glebe and protecting a resident's refund corpus from The Glebe's balance sheet risk (the "**Modification**")

17.     On July 8, 2009, the Commission rejected the Modification.   On October 15, 2009, the Association of Glebe Residents, Inc. ("**Association**"), a corporation formed by current residents concerned about the future of The Glebe, filed with the Commission a Petition to Modify Consent Order consistent with The Glebe's proposed Modification.   An evidentiary hearing was held on April 26, 2010, before a hearing Examiner for the Commission at which The Glebe and the Association presented evidence in support of the Modification.   Post hearing briefs were filed on June 25, 2010, and a decision is expected later this year.

18.    The Cease and Desist Agreement has resulted in the added consequence of increased competition from nearby facilities seeking to take advantage of The Glebe's financial condition to attempt to lure residents away and dissuade prospective residents from joining The Glebe.  Despite these attempts, however, there has been no decrease in occupancy at The Glebe.

19.    In an effort to confront the various financial challenges faced by The Glebe, the Board of Trustees elected to pursue various strategic alternatives, including:

- the retention of CRSA to oversee management;

- the retention of a new marketing consultant;

- the installation of new programs to improve operational efficiencies, reduce operating expenses, and increase occupancy;

- a re-examination of the rate structure;

- a protracted and ultimately unsuccessful negotiation of a forbearance agreement with the Bond Trustee;

- numerous communications with financiers, acquirers, partners, and work out specialists, all of whom were deterred by the Cease and Desist Agreement;

- seeking Medicare licensure as an additional source of income; and

- the proposed Modification to the Commission.

20.    Further, a testament to The Glebe's strong commitments and superior service, The Glebe has enjoyed some success in increasing occupancy through the execution of "Deferred Entrance Fee Agreements."  As of June 17, 2010, 20 new residents executed Deferred Entrance Fee Agreements for a balance as of March 31 of $5,394,000.  A sizable portion of this amount immediately would be available to The Glebe under the Modification to the Commission's Cease and Desist Agreement.  In addition, other individuals have paid a deposit for entrance to The

Glebe and are awaiting the sale of their homes to become residents of The Glebe.  Still others have paid $1,000 to be added to a future reservation list for those who plan to move in sometime in the future.

### III.   FIRST DAY MOTIONS AND ORDERS

21.   Contemporaneously herewith, The Glebe has filed several first day pleadings and proposed orders, each as listed on the attached Exhibit A.  I have reviewed each of these motions and forms of proposed orders and the facts set forth therein are true and correct to the best of my knowledge, information and belief, with appropriate reliance on corporate officers and advisors. Moreover, I believe that the relief sought in each of the motions is vital to enable The Glebe to make the transition to chapter 11 with a minimum interruption or loss of value, and such relief is necessary, in my business judgment and the business judgment of those officers and directors of The Glebe with whom I have considered the same.  In addition to certain administrative motions, The Glebe filed motions for authority (i) to honor certain prepetition employee related claims and (ii) to continue to use its consolidated cash management system, existing bank accounts and granting related relief. Absent this relief, The Glebe may incur significant administrative difficulties and additional expense.

**THE REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY**

In furtherance of its efforts to maximize the value of the estate, The Glebe respectfully requests that orders granting the relief requested in the First Day Motions be entered.

Dated: June 28, 2010

_____, Exec. Dir.
Robert H. Gerndt, Executive Director of The Glebe, Inc.

Subscribed and sworn to before me, this 28 day of June, 2010.

_____
Notary Public

My Commission Expires: July 31, 2010

Registration Number: 165709

CYNTHIA O. HICKS
NOTARY PUBLIC-REGISTRATION # 185709
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES

## EXHIBIT A

### List of First Day Motions

1.   Motion for Entry of an Order Setting a Hearing on First Day Motions

2.   Debtor's Motion to Extend Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs

3.   Debtor's Motion for an Order Limiting Notice, Establishing Procedures for Case Management and Scheduling of Hearings

4.   Application to Retain and Employ LeClairRyan, A Professional Corporation, as Counsel for the Debtor and Debtor in Possession *Nunc Pro Tunc* to the Petition Date Pursuant to Bankruptcy Code Section 327(a)

5.   Application to Retain and Employ Protiviti Inc., as Financial Advisor for the Debtor and Debtor in Possession *Nunc Pro Tunc* to the Petition Date Pursuant to Bankruptcy Code Section 327(a)

6.   Debtor's Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code

7.   Motion for Order Authorizing: (A) Continued Use of the Debtor's Centralized Cash Management System; (B) Maintenance and Continued Use of the Debtor's Existing Bank Accounts and Business Forms; and (C) An Extension of Time for the Debtor to Comply with Section 345 of the Bankruptcy Code

8.   Motion for an Order Authorizing the Debtor to (I) Pay Prepetition Wages and Salaries, (II) Remit Withholding Obligations, and (III) Maintain Certain Employee Benefits Programs and Pay Related Administrative Obligations

9.   Motion for Entry of Interim and Final Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utility Providers Adequately Assured of Future Performance and (C) Establishing Procedures for Determining Adequate Assurance of Payment

10.  Motion for an Order Authorizing the Debtor's Use of Cash Collateral

11.  Motion for Entry of an Order Authorizing the Debtor to Obtain Post-Petition Financing and Approving the Proposed Adequate Protection